McCALEB, Justice.
 

 The Imperial Life Insurance Company was an industrial life insurance company organized under the laws of this State and domiciled in the City of Shreveport. As such, it was regularly subjected to an examination of its condition and affairs by the Secretary of State. During the year 1938, the Secretary of State, after making an examination of the company, reached the conclusion that it had failed to comply with the provisions of Act No. 105 of 1898, as amended, and that, because of its unsound financial condition, it was unable to carry out its contracts. Accordingly, on November 17, 1938, he filed a petition in the District Court for the Parish of Caddo, alleging the insolvency of the company and praying for the appointment of a receiver. On the same day that the petition was filed, the company appeared in court and admitted the charges made against it. Whereupon, a judgment was entered by the court appointing one W. N. Hankins as receiver for the company with full power to take possession of defendant’s property and liquidate and settle its affairs.
 

 During the pendency of the receivership proceeding, Guy T. Helvering, Commissioner of Internal Revenue of the United States, levied against Hankins, as receiver of the defendant company, deficiency assessments in a total amount of $41,647.97 for federal income taxes allegedly due by the defendant as transferee of the assets of two companies known as Imperial Protective Union and American Benefit Association. Notices of the deficiency assessments were' duly mailed to the receiver and no proceedings were thereafter taken by him for a redetermination of the taxes by the Board of Tax Appeals of the United States.
 

 On April 19, 1939, Hankins, as receiver, filed in the receivership proceedings a tableau of debts due by the defendant company. In this tableau, he failed to list the United States Government as a creditor of the defendant for the amount of the income taxes which had been assessed against it by the Commissioner of Internal Revenue. On April 28, 1939, the United States appeared in the receivership proceedings and opposed the homologation of -the tableau of debts on the ground that the company was indebted unto it as transferee of the Imperial Protective Union and American Benefit Association in the sum of $41,647.97 representing income taxes due by those companies for the taxable years 1934, 1935, 1936 and 1937.- It further opposed the homologation of the tableau of debts on the ground that it was a creditor of the defendant company in the sum of $1,-364.24 for social security taxes which were assessed against it under the Federal Social Security Act, 42 U.S.C.A. § 301 et seq.
 

 The receiver resisted any and all liability to the United States for' the tax debts and, after a trial of the issues presented by the opposition, judgment was rendered
 
 *1008
 
 by the district court recognizing the claim of the ‘United States for social security taxes in the sum of $1,364.24 and rejecting its claim for income taxes. The United States has appealed from the adverse decision and the receiver of the defendant company has answered the. appeal praying that the judgment of the lower court be reversed insofar as it recognizes the Government’s claim for social security taxes.
 

 The claim of the Government for federal income taxes against the defendant as transferee of the Imperial Protective Union and American Benefit Association presents the following questions for decision:
 

 (1) Were the Imperial Protective Union and American Benefit Association properly assessed for tax purposes as regular corporations by the Commissioner .of Internal Revenue or should they be classified as life insurance companies under Section 201(a) of the Federal Revenue Acts of 1934 and 1936, 26 U.S.C.A. Int.Rev.Code, § 201(a)?
 

 (2) If the Imperial Protective Union and American Benefit Association have been rightly assessed as regular corporations, is the Imperial Life Insurance Company liable as transferee of those companies for the taxes claimed, under Section 311 of the Revenue Act of 1936, 26 U.S.C. A. Int.Rev.Code, § 311, and Article 311-1 of Treasury Regulations 94 promulgated thereunder ?
 

 In order that these questions may be intelligently discussed, it is necessary to set forth a brief history of the transferor companies as well as the facts which led up to the levy of the assessments against the defendant. American Benefit Association was organized in 1931 under a certificate of incorporation issued by the State of Colorado. The articles of incorporation state the main purpose of the association to be:
 

 “(a) To pay money benefits to the widows, orphans, heirs and devisees of deceased members of the Association in the amount and to the extent to • which they may be entitled according to the by-laws of the' Association, which shall not be deemed an Insurance Company.”
 

 Imperial Protective Union was organized in 1934 under a certificate of incorporation issued by the State of Delaware. The nature of its business and the object of its organization were stated in the third paragraph of the certificate in the following words:
 

 “To unite reputable men, women and children into a Society for the purpose of giving aid and assistance to widows, widowers and those depending on its deceased members, and to issue life membership certificates either on one member or a life membership certificate covering, the member’s whole family group, which shall provide protection and benefits to its members, heirs and dependents after the natural or accidental death of one of its members, and to further aid its members who become injured or totally disabled, and all such aid to be from voluntary contributions (nothing herein shall be construed as to carrying on the business of an insurance company.”
 

 The nature of the business pursued by these two corporations was practically identical. They were not stock companies
 
 *1010
 
 and were theoretically owned and controlled by the insured members. (In truth, they were controlled by one T. L. Morris, who was President, and his brother Hugh Morris, who was Secretary. These men were also the President and Secretary respectively of the defendant Imperial Life Insurance Company.) Membership fees and contributions- or assessments were collected from the members in consideration for policies issued by the associations. The membership fees were payable when the application was made and amounted to $5 per $1,000 of benefits applied for. Policies ranging from $250 to $10,000 in face amount were issued. Regular assessments or premiums were to be collected, without change in rate as long as the policies remained in force. The assessments- or premiums could be paid annually, semi-, annually, -quarterly or monthly. There were provisions for surrendering the policies after 20 years premiums had been paid continuously, when 50 per centum of the value, “determining same as death claims”, would be paid. There were certain other provisions typically found in life insurance policies such as an incontestability clause, double indemnity for accidental death, a reinstatement provision and certain restrictions defining the right of members.
 

 With respect to the American Benefit Association, its books reveal that it undertook to distribute the income received by it from its members in various special fund accounts, i. e. an expense fund, a benefit fund, an administration fund, an exchange fund and a contribution fund. The by-laws of the company provided: “all contributions received from the members of the Association after the membership fee has been paid shall be allocated and divided between the Expense Funds of the Association on the following basis:
 

 Benefit Expense Fund Fund
 

 1st year —4th to 15th monthly payment 25% 75%
 

 2nd year — 16th to 27th monthly payment 50% 50%
 

 3rd year — P^th month on, as long as benefit certificate is kept in force 60% 40%”
 

 The evidence adduced at the trial is somewhat conflicting as to whether the foregoing provision of the by-laws of the company was strictly adhered to. In the report of Mr. Emile Bienvenu, Chief Examiner of the Insurance Department of this State, of November 4, 1936, he states:
 

 “So far as I have been able to ascertain the above ratios are strictly adhered to. I have found, however, that at times transfers of funds have been made from the Expense Fund to the Benefit Fund, but at no time, so far as I have been able to ascertain, have any funds allocated to the Benefit Fund been used for any other purpose than to pay death claims and health and accident claims.”
 

 On the other hand, Mr. Ralph W. Charlton, an Internal Revenue Agent, who made an examination of the books of the company for the Collector of Internal Revenue, stated that the officers of the company had, on numerous occasions, transferred monies out of the benefit fund into an exchange fund and in some instances had replaced
 
 *1012
 
 monies taken from the benefit fund with monies belonging to the expense fund.
 

 With regard to the Imperial Protective Union, there is no evidence to show that that concern ever maintained a benefit fund or any other fund as a reserve to meet contingent policy claims. However, the district judge, in his written reasons for rejecting the Government’s claim for income taxes, stated that he assumed that a fund similar to the benefit fund kept by the American Benefit Association was likewise set aside by the Imperial Protective Union.
 

 During the year 1934, the American Benefit Association and the Imperial Protective Union were acquired by T. L. Morris and Hugh Morris. When we say “acquired”, we mean that these men became the officers of these concerns and that they had full control of the business. Income tax returns were filed by the two companies for the years 1934, 1935, 1936 and 1937 on forms 1120 provided by the United States for corporation income and excess-profits tax returns. In making these returns, the companies claimed exemption from corporate taxation on the theory that they were benevolent life insurance associations under subdivision (10) of Section 101 of the Revenue Act, 26 U.S.C.A. Int. Rev.Code, § 101(10) stating:
 

 “The only and entire income of the corporation for the year consisted of voluntary responses to assessments made on its members for the sole purpose of paying losses and management expenses and any undistributed funds on hand at the end of the year retained to meet future losses and expenses as they may accrue. It has no earned income and no authority to engage in any profit producing activity. See Regulations 94, Page 190, Article 101, 10, l.”
 

 Sometime after these income tax returns were filed with the Government, the Commissioner of Internal Revenue caused an investigation of the companies’ affairs to be made. Mr. Charlton, an Internal Revenue Agent, made an extensive examination of the businesses conducted by the concerns and concluded that they were not entitled to exemption from taxation because they were not, in truth and in fact, benevolent life insurance associations of a purely local character. He accordingly filed his recommendation with the Commissioner of Internal Revenue that they be taxed as ordinary business corporations. The Commissioner adopted the recommendations of Mr. Charlton and thereafter levied the deficiency assessments herein involved against the defendant company as transferee of the tax debtors. The assessments were levied against the defendant because it appears that it acquired, during the year 1937, all of the assets of Imperial Protective Union and American Benefit Association which' amounted to a total sum -of $45,085.
 

 The receiver of the defendant company contends that Imperial Protective Union, and American Benefit Association have been improperly classified as ordinary business corporations by the Commissioner of Internal Revenue; that the evidence shows that they are life insurance corporations and that, if they are held to be such, no tax is due by them in view of the provisions of Section 202(a) of the Revenue Acts of 1934 and 1936, 26 U.S.C.A. Int.Rev.Code,
 
 *1014
 
 § 202(a). He, however, admits that the income tax returns filed by these concerns, in which they claimed that no tax was due because they were benevolent associations, are incorrect and that they do not fall within the exemption granted by subdivision (10) of Section 101 of the Revenue Act.
 

 The Government, on the other hand, while conceding that no tax would be due by Imperial Protective Union and American Benefit Association, if those concerns .are found to be life insurance companies within the meaning of Section 201(a) of the Revenue Act, strongly maintains that they were ordinary business corporations and that the Commissioner of Internal Revenue properly assessed them as such. It is further argued by the Government that the 'deficiency assessments of taxes against the defendant by the Commissioner of Internal Revenue are presumably correct; that, under the jurisprudence, the burden of showing error in the assessments was upon the ■defendant and that the evidence produced "by the receiver is wholly insufficient to warrant the conclusion that the Imperial Protective Union and American Benefit Association were life insurance companies within the meaning of the federal income tax law.
 

 The position of the Government, in respect of the burden of proof being cast upon the receiver to establish that the debt- or corporations were incorrectly assessed as business corporations, is sound. See Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212; Old Mission, etc., Co. v. Helvering, 293 U.S. 289, 55 S.Ct. 158, 79 L.Ed. 367, and Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623. The evidence shows that the two concerns in question filed income tax returns in which they claimed exemption from taxation on the theory that they were voluntary benevolent associations. These returns are admittedly incorrect for it is conceded by the receiver that the companies were not the type of voluntary benevolent associations which are exempt from taxation under the income tax law. The Commissioner of Internal Revenue, after a full investigation of the companies’ affairs, found that they were not exempt and levied tax assessments against their transferee upon his determination that they were, in fact, ordinary business corporations. The receiver for the transferee, in now contending that they are life insurance companies and not liable as such for the payment of the tax, obviously carries the burden of establishing it as a fact forasmuch as life insurance companies are treated under the federal income tax law as taxpayers of a special class and are granted certain exemptions with respect to their income which are not accorded to ordinary business corporations. In Bowers v. Lawyers’ Mortg. Co., 285 U.S. 182, 52 S.Ct. 350, 352, 76 L.Ed. 690, the Supreme Court of the United States said:
 

 “But, if it was ah insurance company taxable under section 246, it was excepted from the general rule by subsection (b).
 
 As such corporations constitute a special classj respondent must be held liable for the capital stock tax unless clearly shown to have been an insurance company within the meaning of the act.”
 
 (Italics ours.)
 

 
 *1016
 
 In Welch v. Helvering, supra [290 U.S. 111, 54 S.Ct. 9, 78 L.Ed. 212], the court stated:
 

 “The Commissioner of Internal Revenue resorted to that- standard in assessing the petitioner’s income, and found that the payments in controversy came closer to capital outlays than to ordinary and necessary expenses in the operation of a business.
 
 His ruling has the support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong.
 
 Wickwire v. Reinecke, 275 U.S. 101, 48 S.Ct. 43, 72 L.Ed. 184; Jones v. Commissioner of Internal Revenue [7 Cir.] 38 F.(2d) 550, 552.” (Italics ours).
 

 With the foregoing principles in mind, we approach a discussion of the facts and the law of the case. At the outset, it is to be noted that the charters of the debt- or corporations state that the companies shall not be deemed to be insurance companies. However, these charter declarations, while significant, are not binding upon the defendant company, for it is the settled jurisprudence that the inquiry should be to discover the true character of the business actually conducted by the concerns rather than to be guided exclusively by the label which they, themselves, have placed upon their operations. See Bowers v. Lawyers Mortg. Co., supra.
 

 Section 201(a) defines a life insurance company as follows:
 

 “(a) Definition. When used in this title, [chapter] the term ‘life insurance company’ means an insurance company engaged in the business of issuing life insurance and annuity contracts (including contracts of combined life, health, and accident insurance),
 
 the reserve funds of which held for the fulfillment of such contracts comprise more them 50 per centum of its total reserve funds.”
 
 (Italics ours)
 

 Counsel for the receiver contend th'at the Imperial Protective Union and American Benefit Association were life insurance companies because they issued life policies to their members in consideration of regular premiums. In the sense that they were insuring the lives of their members, the companies were manifestly engaged in the life insurance business. But that is not the question. The question is whether they were life insurance companies within the meaning of the term as defined by the federal statute, that is, did these companies keep or accumulate reserve funds to be held for the fulfillment of their insurance contract and, if so, did the reserve funds “comprise more than 50 per centum of its total reserve funds”?
 

 This question must be answered in the negative as we find that the evidence submitted at the trial is wholly insufficient to justify a holding that “reserves” as contemplated by the statute were actually set aside or kept by the tax debtor corporations. With respect to the Imperial Protective Union, there is no evidence of probative value which exhibits that any reserve for the payment of contingent and future claims was ever set aside by the company. In the case of the American Benefit Association, it is shown that it did keep a fund known as a benefit fund which might be considered as a reserve fund. However, there has been no proof submitted by the
 
 *1018
 
 receiver to demonstrate that this benefit or reserve fund comprised more than 50 per centum of the total reserve funds of the company. In the absence of such proof, the company cannot be properly classified as a life insurance company as defined by Section 201(a) of the federal statute.
 

 Moreover, a review of the evidence discloses to our satisfaction that the Imperial Protective Union and American Benefit Association were not life insurance companies which kept reserves within the true intendment and meaning of the federal law. On the contrary, the character of the business which was carried on by these concerns prompts us to conclude that they appear to resemble assessment associations which issue life policies without contemplating the accumulation of reserves based on actuarial calculations which are expected to absorb the increasing cost of insurance as the policy holder grows older.
 

 The use of the words “reserve funds” in the definition contained in Section 201(a) of the statute presupposes, we think, typical legal reserves based on actuarial calculations and recognized tables of mortality or other experience. The Treasury Department has interpreted the provisions of Section 201(a) in this sense for, in Treasury Regulations
 
 86
 
 promulgated under the Revenue Act of 1934, reserve funds are defined in Article 203 (a) (2)-l as follows:
 

 “In general, the reserve contemplated is a sum of money, variously computed or estimated, which, with accretions from interest, is set aside (reserved) as a fund with which to mature or liquidate, either by payment or. reinsurance with other companies, future unaccrued and contingent claims. It must be required either by express statutory provisions or by rules and regulations of the insurance department of a State, Territory, or the District of Columbia when promulgated in the exercise of a power conferred by statute, but such requirement, without more, -is not conclusive; for example, it does not include reserves required to be maintained to provide for the ordinary running expenses of a business definite in amount, and which must be currently paid by every company from its income if its business is to continue, such as taxes, salaries, reinsurance and unpaid brokerage; the reserve or net value of risks reinsured in other solvent companies to the extent of the reinsurance; reserve for premiums paid in advance; annual and deferred dividends; accrued but unsettled policy claims; losses incurred but unreported; liability on supplementary contracts not involving- life contingencies; estimated value of future premiums which have been waived on policies after proof of total and permanent disability.
 

 “In any cases where reserves are claimed, sufficient information must be filed with the return to enable the Commissioner to determine the validity of the claim. Reference should be made to the item in which the reserve appears in the annual statement and to the statute or insurance department ruling requiring that such reserves be held. Only reserves which are so required, which are peculiar to insurance companies, and which are dependent upon interest earnings
 
 *1020
 
 for their maintenance will be considered. A company is permitted to make use of the highest aggregate reserve called for by any State or Territory or the District of Columbia in which it transacts business, but the reserve must have been actually held.
 

 “In the case of life insurance companies issuing policies covering life, health and accident insurance combined in one policy issued on the weekly premium payment plan, continuing for life and not subject to cancellation, it is required that reserve funds thereon be based upon recognized tables of experience covering disability benefits of the kind contained in policies issued by this particular class of companies. The deduction in respect of such reserve funds (not required by law) is 3% per cent of the mean of such reserve funds held at the beginning and end of the taxable year.”
 

 Hence, in order to constitute a true insurance reserve fund as contemplated by the statute, it must be provided for by State statutory provision or computed or estimated upon some sort of actuarial basis. It is well settled by decisions of the federal courts that a regulation by a department of the Government (such as the above quoted one) addressed to and reasonably adapted to the enforcement of an Act of Congress, the administration of which is confided to such department, has the force and effect of law if it be not in conflict with express statutory provision. Maryland Casualty Co. v. United States, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297; United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563; United States v. Birdsall, 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930; United States v. Smull, 236 U.S. 405, 35 S.Ct. 349, 59 L.Ed. 641, and United States v. Morehead, 243 U.S. 607, 37 S.Ct. 458, 61 L.Ed. 926.
 

 In defining reserve funds as applied to income tax laws, vol. 37, Words and Phrases, Perm.Ed., page 149, informs:
 

 “The term ‘reserve’ or ‘reserves’ in insurance law, relative to provisions of Excise and Income Tax Acts, allowing additions to ‘reserve funds,’ required by law, of insurance companies, to be deducted from income to be taxed, is technical, and in general means money which with accretions from interest, is set aside with which to mature or liquidate future unaccrued and contingent claims, and claims accrued, but indefinite as to amount or time of payment, * *
 

 In the case of Commissioner of Internal Revenue v. Monarch Life Ins. Co., 1 Cir., 114 F.2d 314, 319, the court, in speaking of life insurance reserves, said:
 

 “The cases which discuss the question of reserves, under various forms of insurance, set up definite requirements for a technical insurance reserve. It must pertain directly to insurance and be calculated upon the basis of an experience or actuarial table applicable to the nature of the risk involved, with an interest assumption involved in the calculation. It must be set up and maintained out of premiums and earnings from the investment thereof, and be maintained for the purpose of maturing and liquidating, either by payment or reinsurance with other companies, future, unaccrued and contingent claims.”
 

 
 *1022
 
 Thus, we see that all of the federal law on the subject points to the conclusion that the reserves mentioned in the definition of life insurance companies under the federal income tax law mean funds, accumulated and set aside on calculations based on some table of mortality, to be used to take care of future unaccrued and contingent policy claims. Section 201(a) further declares that these reserves shall exceed by one-half the reserves kept for other purposes in order for the company to be classified as a life insurance company. The burden was upon the receiver to demonstrate that such reserves were kept. Since he has failed to do so, we cannot say that the deficiency assessment levied by the Commissioner of Internal Revenue is erroneous.
 

 The district judge, in his written reasons for rejecting the Government’s demand, relied heavily upon the decision in Commissioner of Internal Revenue v. W. H. Luquire Burial Ass’n Co., 5 Cir., 102 F.2d 89. That case.is not authority for the proposition that the reserve funds mentioned in Section 201(a) do riot contemplate reserves calculated .upon tables of mortality. On the contrary, the opinion clearly points out that Luquire Company was required to, and did, maintain reserves computed by actuaries of the Insurance Department of Alabama according to standard industrial tables of mortality.
 

 Since we hold that Imperial Protective Union and American Benefit Association were properly taxed as regular business corporations, we address our attention to the question as to whether the defendant company is responsible as transferee of those concerns for the payment of the taxes levied by the Commissioner.
 

 The evidence shows that, during 1937, the memberships of American Benefit Association and Imperial Protective Union were acquired through the execution of contracts by the Imperial Life Insurance Company. At the time of the transfer of the membership, there was also transferred from the Imperial Protective Union to the defendant company the sum of $5,085 and from the American Benefit Association the sum of $40,000. These sums were transferred pursuant to resolutions adopted by the respective companies to be held by the defendant company for the benefit of the membership of the transferor companies. The defendant company expressly did not subject its other assets to the payment of the debts or obligations of the transferor companies. With respect to Imperial Protective Union, the purpose of the transfer, as stated in the minutes of the meeting of its members and directors, was to place the membership in a corporation under the supervision of a State Insurance Commission. It further appears that the amounts, turned over by the transferor companies to the defendant company constituted practically all of the assets of the transferor companies.
 

 Section 311(a) of the Revenue Act of 1936 provides:
 

 “The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subj ect to the same
 
 *1024
 
 provisions and limitations as in 'the case of a deficiency in a tax imposed by this title [chapter] (including the provisions in case of delinquency in payment after notice and demand, the provisions authorizing distraint and proceedings in court for collection, and the provisions prohibiting claims and suits for refunds) :
 

 “(1) Transferees. The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this title [chapter].”
 

 The evidence discloses to our satisfaction that the defendant company was a transferee within the meaning of the federal statute and therefore liable for the payment of the income tax due by the transferor companies to the extent of the value of the assets ($45,085) which it received from them. The defendant, by these transfers, acquired all of the tangible assets of the transferor concerns to the prejudice of the Federal Government and other creditors. Those companies were obviously rendered insolvent by the transaction. The fact that the transfers were for the purported consideration of the liability of the transferor concerns to their policyholders does not of itself render the transfers immune from attack since it appears that, as a result, the transferring companies were stripped of their assets to the prejudice' of creditors. See First National Bank of Ruston v. Jones, 186 La. 269, 172 So. 155; Southland Inv. Co. v. Michel, La. App., 149 So. 177, and Knox Glass Bottle Co. v. Golden Gate Liquor Co., La.App., 174 So. 684. It is' well settled by controlling authorities that the Government may recover, under the federal statute, from distributees of assets of an insolvent corporation the value of what they receive in order to discharge the taxes assessed against a tax debtor corporation. See Phillips v. Commissioner, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289; United States v. Updike, 281 U.S. 489, 50 S.Ct. 367, 74 L.Ed. 984; Leighton v. United States, 289 U.S. 506, 53 S.Ct. 719, 77 L.Ed. 1350, and Scott v. Commissioner, 8 Cir., 117 F.2d 36.
 

 It is true that, at the time of the transfer to the defendant company, the transferor companies had not been assessed with deficiencies in income tax. But this fact is'not sufficient ground to warrant an avoidance of liability for the taxes, for it has been held that a subsequently levied tax is nevertheless a potential liability of a corporation of which its officers and stockholders are charged with notice. See United States v. Armstrong, 8 Cir., 26 F.2d 227; Updike v. United States, 8 Cir., 8 F.2d 913, and Scott v. Commissioner, supra. And, in determining the question of insolvency, a liability for taxes, though unknown at the time of the transfer must be considered. See Commissioner v. Keller, 7 Cir., 59 F.2d 499, and Scott v. Commissioner, supra.
 

 In addition to the question of insolvency, the transfers in the instant case are invalid for another reason. The evidence makes it plain that the manner in which the assets of the transferor companies were turned over to the defendant bears all of the earmarks of a fraudulent
 
 *1026
 
 conveyance. The Morris brothers, who, as we have said, actually controlled the operations of all three companies, made the transfers as President and Secretary of the transferor concerns and then, acting in their capacity as President and Secretary respectively of the defendant transferee, accepted the assets for the transferee. It is manifest that, because of the control the Morris brothers and their associates exercised over the respective companies, they were in a position to deal between themselves in any way they saw fit. And it is not unreasonable to assume that, in view of the nature of the transaction, the transfers were made solely for the purpose of bolstering the finances of the defendant company which, at that time, was upon the verge of failure. In other words, .the transactions confected by the Morris brothers were tantamount to taking money out of one pocket and putting it in another.
 

 The cases relied upon by the receiver, in his plea that the defendant is not liable as a transferee, are inapplicable to the facts of this case.
 

 Finally, the receiver complains that the Judge of the District Court erred in recognizing the claim of the United States for social security taxes in the sum of $1,364.24. His argument on this question seems to be that the Government has no lien on the assets of the defendant company for the recovery of the taxes due. We find no substance whatever in the point since the Government is not requesting that a lien be enforced but only that it be recognized as a creditor of the defendant corn-pany in the tableau of debts filed by the receiver.
 

 For the reasons assigned, the judgment appealed from, insofar as it rejects the opposition of the United States for federal income taxes assessed against the defendant company as transferee of Imperial Protective Union and American Benefit Association, is reversed and it is now ordered that the opposition be sustained and that there be judgment in favor of the United States of America, opponent, and against Imperial Life Insurance Company, in receivership, recognizing said opponent to be a creditor of said Imperial Life Insurance Company, in receivership, for federal income taxes in the full sum of $41,647.97. In all other respects, the judgment of the District Court is affirmed. Defendant-appellee to pay all costs.